*DELAWR'E, 1818.*

*United States v. The sloop Pitt her tackle &c.*

---

# GENERAL· COURT.

## VIRGINIA, 1815.

*Jackson v. Row.* } UPON A CASE ADJOURNED TO THE GENERAL COURT OF VIRGINIA, BY THE SUPERIOR COURT OF LAW, FOR THE COUNTY OF ———.

*Jurisdiction of state courts.*

This case was adjourned to the last June term, and continued over for consideration to the November term. At that term, it was argued by the attorney of the United States, for the district of Virginia, before the court, consisting of Judges White, Carrington, Stuart, Holmes, Brockenbrough, Allen, Semple, Randolph and Daniel; and at a subsequent day of the same term, Judge White delivered the opinion of the court, as nearly as can now be recollected, to the following effect.

This is an action of debt, brought by the plaintiff to recover a penalty inflicted by an act of congress to insure the collection of the revenue of the United States, which

VIRGINIA,
1815.

Jackson.
v.
Row.

penalty, the same act says, may, under circumstances, such as exist in this case, be recovered in a state court; and the question submitted to the general court is, substantially this: could congress constitutionally give to a state court jurisdiction over this case, or can such court be authorized by an act of congress to take cognizance thereof?

The very statement of the question points out its extreme delicacy and great importance.—It involves the great constitutional rights and powers of the general government, as well as the rights, sovereignty and independence of the respective state governments. It calls upon this court to mark the limits which separate them from each other; and to make a decision which may possibly put at issue, upon a great constitutional point, the legislature of the United States, and the supreme criminal tribunal of one of the states.

Such a question, involving such consequences, ought to be approached with the utmost circumspection, with the most cool, dispassionate and impartial investigation, and with a fixed determination to render such judgment only as shall be the result of solemn conviction. The court has not been unmindful of these things; it has approached the subject with those feelings, and with that determination. It has bestowed its best consideration, its deepest reflection, upon it; and after having viewed it in every point of light in which it has been placed by others, or in which the court has been able to place it, has made up an opinion in which all the judges present concur, and which it has directed me to pronounce.

But before that is done, it will be necessary to lay down and explain certain principles on which it is founded.

1st. It is believed, that the judicial power of any state or nation forms an important portion of its sovereignty, and consists in a right to expound its laws, to apply them to the various transactions of human affairs as they rise, and to superintend and enforce their execution; and that whosoever is authorized to perform those functions to any extent, has, of necessity, to the very same extent, the judicial power of that state, or nation, which authorized him to do so.

2d. That the judiciary of one separate and distinct

sovereignty, cannot of itself assume, nor can another separate and distinct sovereignty either authorize or coerce it to exercise the judicial powers of such other separate and distinct sovereignty.

It is, indeed, true, that the interest of commerce, and the mutual advantages derived to all nations by their respectively protecting the rights of property to the citizens and subjects of each other, whilst residing or trading in their respective territories, have induced civilized nations generally to permit their courts to sustain suits brought upon contracts made in foreign countries, and to enforce their execution according to their true intent and meaning. And in order to ascertain that our courts do permit the laws of the country, where the contract was made, to be proved to the jury, or the court of chancery, as the case may be, as facts entering essentially into the substance of the contract. But, in doing all this, they do not act under the command, or by the authority of the sovereign of that nation. Nor are they exercising any portion of its judicial powers. They are only expounding, applying and superintending the execution of the law of their own state which authorizes that mode of proceeding.

But though there are the best reasons for permitting our courts to sustain suits of this description, there is no good reason why one nation should authorize its judiciary to carry the penal laws of another into execution, and it is believed that no nation has ever done so. And, as has already been stated, there is no principle of universal law which authorizes one sovereign to empower or direct the judiciary of another to do so. Such a right can be acquired by compact only. And we shall presently see whether congress has so acquired it. Without such compact, a fugitive from justice cannot even be demanded, as of right, to be delivered up to the tribunals of the nation whose laws he has violated, much less can he be tried and punished by a foreign tribunal for violating them.

If such a system shall once be adopted it will introduce a strange kind of Mosaic war into the judiciary of nations. Here a Cadi sitting in judgment upon an Italian denying the Pope's infallibility: there the stern Fathers of the Holy Inquisition putting a poor Turk to

the rack because he denies that Mahomet is the Prophet of God.—The judges of republican Virginia pillorying an Englishman for libelling royalty; and the court of king's bench inflicting the same punishment upon an American for libelling the government of the United States, for the late declaration of war.

*Thirdly.* That the government of the United States, although it by no means possesses the entire sovereignty of this vast empire, the great residium thereof still remaining with the states respectively, is nevertheless, as to all the purposes for which it was created, and as to all the powers vested therein, unless where it is otherwise provided by the constitution, completely sovereign; and that its sovereignty is as entirely separate and distinct from that of another. So that, unless as before excepted, it cannot exercise the powers that belong to the state governments, nor can any state government exercise the powers which belong to it. And that there is no one thing to which this principle applies with more strength than to the revenue of the United States and things appertaining thereto; it being notorious that a desire to give congress complete and entire control over that subject was the great and moving principle which called the present constitution into existence. It is admitted, however, that there are some exceptions to this last principle; they are such, however, as only prove the rule itself. Thus, by the second section of the third article of the constitution, among other things it is declared, that "the judicial power of the United States shall extend to controversies between citizens of different states, between citizens of the same state, claiming lands under grants of different states," &c. These powers, in the nature of things, belong to the state sovereignties, and they were, at the time of the adoption of the constitution, in complete possession of them, nor could the courts of the United States, merely as such, by any principle of construction, have claimed them; but there were reasons, at that time deemed sufficient, to justify the extending the judicial power of the United States to them, and they were extended to them, without, however, taking away the jurisdiction of the state courts; so that, as respects those matters, the state courts

and the courts of the United States have concurrent jurisdiction, by compact.

These things being premised, I return to the question: Can congress, by any act which it can pass, authorize the state courts to exercise or vest in them any portion of the judicial power of the United States; more especially that portion of it which is employed in enforcing their penal laws?

I shall not stop here to prove that the act in question is, as respects this case, a penal law, or that to enforce the payment of its penalties, in any way or form, whatsoever, would be to execute, to enforce it. These are self-evident propositions which would only be obscured by any attempt to elucidate them.

Nor shall I waste much time in considering whether our courts can resist an unconstitutional law. That question, as it respects our state laws, has long since been settled in Virginia, and the decisions of her courts have been acquiesced in by the general assembly, with that wisdom and magnanimity which belong to it.

This argument is much stronger as respects the laws of congress, the legislature of a separate and distinct sovereignty, by whose laws we are not bound, unless, to use the very words of the constitution, they are "made in pursuance thereof." Were it otherwise; were the state courts obliged to execute every law which congress might pass, without inquiring whether it was or was not made in pursuance of the constitution, it is most manifest, that the justly-dreaded work of consolidation would not only be begun, but that, in principle, it would be completed: and that state sovereignty and state independence would soon cease to exist.

We have already seen that the government of the United States is, as to the purposes for which it was created, a separate and distinct sovereignty, having rights, powers, and duties, which it is bound to exercise and discharge itself, and which it cannot communicate to the states over which it presides, and which they cannot intermeddle with, and that the judicial power forms a portion, and a most important portion it is, of its sovereignty.

We have seen that there is nothing in universal law, or the usage of nations, which will authorize one sove-

reignty to invest its judicial power, or any part of it, in the courts of another, or direct them to execute it; more especially that portion which respects its penal code.

If, then, congress has a right to vest that, or any other portion of the judicial power of the United States, in the state courts, it must be in virtue of some compact. But there is no other instrument from which such a compact can be inferred but the constitution of the United States. Let us then see where it has deposited the judicial power of the general government; for where it has placed it, there it must remain.

That instrument does not take the least notice of the state courts as respects this subject. But it declares, section 1st of the 3d article, that "the judicial power of the United States shall be vested in one supreme court, and in such inferior courts as congress may, from time to time, ordain and establish." And by the 8th section of the first article, power is given to congress "to constitute tribunals inferior to the supreme court."

This judicial power then, the whole of it, without any exception, is given to this supreme court, and those inferior courts to be ordained and established by congress. It has never yet been contended that congress can compel or authorize the state courts, or any of them, to perform the functions of the supreme court. By what kind of reasoning then can it support a claim to exercise such a power with respect to the functions of these inferior courts? Did congress ordain and establish the state courts? Did it decree their existence? Did it appoint their judges? Did it institute, did it settle, did it constitute them? Most certainly it has done none of those things. It found them already ordained and established; and finding them so ordained and established, it has by its law directed them to exercise this portion of judicial power of the United States.

But the judges of these inferior courts are to have offices which they are to hold during good behaviour. Now, I take it for granted, that the man who holds an office is an officer, and an officer too of that government whose business it is the duty of his office to perform. And by the 3d section of the 2d article of the constitution, "all officers of the United States are to be com-

missioned by the president," which the state judges are not.

But who does the constitution intend shall decide upon the good behaviour of the judges of these inferior courts? Most unquestionably the senate of the United States, upon impeachment by the house of representatives. So great an absurdity cannot be supposed, as that the constitution intended to put the judicial power of the United States, or any part of it, into the hands of judges in no wise responsible to its government. Yet no man can pretend that the state judges can be impeached and tried by that government.

Besides, the constitution of the United States does not provide that the state judges shall hold their offices during good behaviour. Congress cannot direct that it shall be so by law, and, in fact, some of them are elected for a limited period, and others may be removed by a vote of their state legislatures. So that if a law of congress should be very unpopular in one of those states, the judges could not execute it but at the risk of their commissions.

Moreover, the judges of the state courts are called upon by this act to exercise judicial power, which they hold at the will of congress, and which may be taken from them by the very breath which gave it; and which it is almost certain, will be taken from them whenever, by a firm and independent exercise of their own judgments, they shall much offend that honorable body. So that under this system, neither the peeple, nor the government of the United States, would have that security for the uprightness of their judges which the constitution contemplates.

But the judges of these inferior courts are also to receive for their services a compensation which shall not be diminished during their continuance in office, nor during the existence of a particular law, calling for particular services.

From whom are they to receive this compensation? Certainly from the general government, to which those services are to be rendered. But do the state judges receive, or are they to receive, any compensation for these services to be rendered to the United States? Every body knows that they do not. And we know,

VIRGINIA, that if any judge of the state was to accept either commis-
1815. sion or compensation from the general government, he
would by that act vacate his office.

Jackson      But it is said, that the state courts do take cognizance
v.       of suits brought to enforce contracts made in foreign coun-
Row.      tries, and that they will take notice of those foreign laws,
under the faith of which such contracts were made, and
enforce them agreeably thereto, and that this suit sounds
in contract. But how does it sound in contract? Has
the defendant contracted to pay the amount of this penalty
to the plaintiff? No, it is answered, it is not precisely
so. But it is understood to be a principle of univer-
sal law, that every citizen and subject has entered into an
implied contract, that he will obey the laws of his coun-
try—that the laws of his country subject the defendant to
the payment of this penalty—that this suit is founded on
that contract, and the state court has, for that reason, juris-
diction over it. Indeed! But before we yield our assent,
let us see how far this reasoning will carry us. It is some-
times said, that an argument which necessarily proves too
much, proves nothing.

By this same implied contract, every citizen and sub-
ject of every government has agreed to submit his head
to the block, or his neck to the cord, whenever the laws
of his country require him to do so. If, therefore, this
implied contract will give us jurisdiction over this penal
law, and justify us in enforcing its sanction, the same prin-
ciple will give us jurisdiction over the entire penal code of
every nation upon the earth, which no man can pretend to
say we have.

Upon the whole, however painful it may be, and ac-
tually is, to us all, to be brought, by a sense of duty, into
conflict with the opinions and acts of the legislature of
the United States, for which we entertain the highest
respect, and the constitutional laws of which we feel it
our duty to obey and execute with cheerfulness, when
their execution devolves upon us; yet we cannot resist
the conviction, that this law is, in this respect, unconsti-
tutional. It is the unanimous opinion of this court, that
to assume jurisdiction over this case, would be to exer-
cise a portion of the judicial power of the United States,
which, by the constitution, is clearly and distinctly depo-

sited in other hands; and that by so doing, we should prostrate that every instrument which we have taken a solemn oath to support.